# Southeastern Greyhound Lines, Inc. v. Burris.

January 14, 1949.

John B. Anderson and Rodman W. Keenon for appellant.

Beckham A. Robertson and Claude E. Smith for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

The appellee, Elizabeth Burris, recovered a judgment for $2,625 against Southeastern Greyhound Lines, Inc. In her petition she alleged that:

"* * * on the 13th day of June, 1947, about the hour of 7:30 o'clock a. m., in pursuance to a duly authorized ticket entitling her thereto, she boarded one of the defendant's passenger buses at Louisville, Kentucky for the purpose of being carried and transported as a pas-

senger for hire therefrom to Owensboro, Daviess County, Kentucky, said bus being scheduled to arrive at her destination in Owensboro, Kentucky at about the hour of 11:30 o'clock a. m. on said date.

"Plaintiff states that while she was on defendant's bus as a passenger for hire, as aforesaid, enroute from Louisville, Kentucky to Owensboro, Kentucky, she became violently ill and that her said illness was brought to the attention of and was then and there known by defendant, its servants and employees in charge of the operation of said bus; that by reason of her illness she was practically helpless and needed and was entitled to special care, attention and consideration such as is suggested by dictates of common humanity; that defendant, its servants and employees in charge of the operation of said defendant's bus, with full knowledge of plaintiff's sickened and helpless condition carelessly and negligently failed and refused to in anywise administer or cause to be administered to her."

She further alleged that when the defendant's bus arrived at the bus station in Owensboro about 11:30 a. m. she was physically unable to leave the bus without assistance and she requested the driver of the bus to assist her therefrom, but he refused to permit her to leave the bus and negligently carried her beyond her destination to Evansville, Indiana, where, after considerable delay, she was taken to a hospital where she remained until June 17, 1947, when she was transported back to Owensboro in an ambulance by her husband and placed in the Kentucky Convalescent Home. She alleged that by reason of the negligent and wrongful acts of the defendant her illness was greatly aggravated and the duration thereof prolonged, and that she had incurred and would be required to incur in the future additional medical and nursing expenses of more than $1,000 because the defendant negligently carried her beyond her destination where she would have received prompt medical attention. She sought to recover $10,000 for physical pain and mental anguish and $1,000 special damages.

Reversal of the judgment is sought on numerous assigned grounds, but they will be considered under three headings: (1) Error of the court in overruling

appellant's motion for a directed verdict; (2) errors in the admission and rejection of testimony; and (3) errors in the instructions.

The appellee, a married woman 49 years of age, had been suffering from hypertension or high blood pressure for three or four years prior to June 7, 1947, when she purchased a bus ticket from Owensboro, Kentucky, to Bellevue, Michigan, and return. She left Bellevue on her return trip on June 12, rode all night, changed buses at Louisville, and left Louisville at 7:30 a.m. on June 13. Appellee testified that she had a paralytic stroke at Hardinsburg, a point about halfway between Louisville and Owensboro. The stroke was preceded by a severe headache. On direct examination she said that she told the bus driver at Hardinsburg she was sick. On cross-examination she was asked these questions and made these answers:

"Q. Mrs. Burris, what was your feeling when this paralytic stroke came upon you? A. I had a headache.

"Q. Did you faint? A. No, sir.

"Q. What other feeling did you have except the headache, if you remember? A. A funny feeling in my limbs.

"Q. Did you notice then that you could not move your left limb then? Did you notice at that time you could not move your limb when you had this headache? A. It wasn't but a little while.

"Q. How long would you say, if you recall? I do not want to worry you now. I want to know how long it was after you had your headache until you felt this funny feeling in your limb that was affected? A. About 20 minutes.

"Q. Was it at that time, or after that time, that you talked to the driver of the bus about being sick? A. It was before that time.

"Q. You did not have a headache at Hardinsburg? A. I had an awful headache at Hardinsburg.

"Q. Did you have any funny feeling in your limbs at that time? A. At Hardinsburg I felt like they went to sleep.

"Q. Could you move your leg then when it felt like it went to sleep? A. Not very much.

"Q. Where were you sitting in the bus? A. About two or three seats behind the driver.

"Q. Did you get up out of your seat and talk to the driver? A. I couldn't.

"Q. Why not? A. Because I was affected with this paralytic stroke.

"Q. You mean to say that you could not walk up and talk to the driver of the bus? A. I told him I was sick and he had so many minutes at Hardinsburg; 15 minutes is all that you have to get a drink and lunch and I said 'I won't be in there long because I am sick.'

"Q. That is all you said to the driver was it? A. Yes, sir, I told him I was sick.

"Q. Did you get off the car and go into the lunch stand and get your lunch? A. No, I didn't, because I couldn't get off and I was afraid I would miss the bus and I stayed on there.

"Q. So you did not go into the lunch stand? A. No, sir.

"Q. You say you did not walk up and talk to the bus driver? A. I didn't get out of the bus to get a lunch and I told him I was sick.

"Q. As you started to get out of the bus to go into the lunch stand you told the bus driver you were sick? A. Yes, sir.

"Q. Could you walk at that time? A. No."

Appellee testified as follows as to what occurred when the bus arrived at Owensboro:

"Q. When you got to the bus station here in Owensboro what happened then? A. They wouldn't let me off.

"Q. Who would not let you off? A. The bus driver. I told him two or three times 'Here is where I get off,' and he said 'I am sorry, we can't let you off,' and I said 'Why?' and he said 'Because this bus runs from Evansville to Owensboro,' and to get off at Owensboro I could have got medical aid right there.

"The defendant objected to this answer and the Court, being advised, overruled said objection, to which ruling the defendant excepted.

"Q. Did you ask the bus driver to let you off? A. Yes, sir.

"Q. How many times did you ask him to let you off the bus here in Owensboro? A. I kept begging him for 10 minutes to let me off. I said 'My husband is in there in the bus station,' and they wouldn't let me off. They took me to Evansville.

"Q. At the time you arrived in Owensboro what physical condition were you in? A. Paralyzed.

"Q. Was your whole body paralyzed, or only a portion of it? A. The left side."

She then testified that she was carried to Evansville, Indiana, and taken from the bus station there in a police ambulance to a hospital.

Dr. J. H. Harrison testified that he saw appellee in September, 1947, and that she was suffering from hemiplegia, or paralysis of one lateral half of the body. He was asked if appellee's condition would have been alleviated if she had been given treatment immediately at the time she suffered the attack, and he answered: "That is a hard question to answer. That is counting on potentialities." When pressed for his opinion, he said: "She would have had a better chance to have gotten better with the treatment than she would without it. I will put it that way." Dr. J. S. Oldham treated appellee at the Kentucky Convalescent Home in Owensboro four or five days after she became ill. He said she was suffering from cerebral hemorrhage or paralysis, and that the proper treatment in such cases is absolute rest and the administration of sedatives and glucose. He expressed the opinion that if she had been treated when she had the severe headache the paralysis might have been prevented, but he was unable to state positively that her condition was aggravated because she had not received treatment sooner. Claude Burris, husband of appellee, testified that he was at the bus station in Owensboro for the purpose of meeting his wife when the bus arrived at 11:30 a. m. He saw several passengers alight from the bus, but did not see his wife in the aisle or

standing at the door of the bus. He made no inquiry about her, but returned to the station that night to meet the next bus from Louisville which was due at 9:30 p. m. The foregoing is the substance of the evidence introduced by the plaintiff.

The defendant introduced Dr. John Howard Scofield, Jr., who treated the plaintiff at Welborn Baptist Hospital in Evansville from June 13 to June 17. He found she had had a cerebral hemorrhage and was suffering from severe hypertension. Her blood pressure was 240 over 170, and remained about the same during her stay in the hospital. There was no evidence of trauma, and in his opinion the cerebral hemorrhage was caused by high blood pressure. Everett S. Burton, driver of the bus, testified that appellee boarded his bus at Louisville and took a seat in the rear. She did not appear to be ill. When the bus left Hardinsburg she apparently was asleep. He announced the station when the bus reached Owensboro, and before leaving for Evansville counted his tickets and the passengers and found they coincided. There were 21 passengers on the bus when it left Owensboro and he had 21 tickets. The number of passengers between Louisville and Evansville varied between 20 and 30. After the bus reached Evansville he was informed by the pillow man that one passenger had failed to alight, and he found appellee apparently asleep seated in the rear of the bus. He tried to rouse her, but was unsuccessful. The police department was notified, an ambulance soon arrived, and appellee was taken from the bus, placed on a stretcher, and taken to the hospital. Burton was corroborated as to the appellee's condition by four police officers who assisted in removing her from the bus. He stated positively that he had no conversation with appellee at Hardinsburg, Owensboro, or at any other point after the bus left Louisville, and that he had no notice of her illness either from her or any of the other passengers. All of the passengers had left the bus at Evansville and disappeared before appellee's presence was discovered, and he knew none of their names.

While it cannot be said that appellee's account of what occurred at Owensboro is incredible, yet it certainly is highly improbable. However, it was for the jury to say whether she was to be believed. If her tes-

timony is true, the appellant was negligent in taking her beyond her destination and is liable for the damages resulting from such negligence. The court, therefore, did not err in overruling appellant's motion for a directed verdict.

It seems to be appellee's contention that she should have been moved from the bus at Hardinsburg and given medical attention, and she cites the rule announced in Casteel v. American Airways, 261 Ky. 818, 88 S. W. 2d 976, 980, where the court said: "After having entered upon his journey, if the passenger becomes sick or in a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity toward him until some suitable provision be made. This may require that he be removed and left at a suitable place until he becomes able to resume his journey or until he shall obtain proper aid and assistance."

There is no evidence that the driver of the bus knew at Hardinsburg that Mrs. Burris was in a helpless condition and needed medical attention, or that her condition was so apparent as to charge him with knowledge of it. Apparently none of the passengers realized that she was ill. She merely stated to the driver that she was sick, but did not indicate that she needed special assistance or medical attention. She gave as one of the reasons for not alighting at Hardinsburg that she was afraid she would miss the bus. The evidence fails to show that the driver of the bus had notice of appellee's need of special assistance prior to the arrival of the bus at Owensboro, and until he received such notice he was under no duty to render any special service. Wilson v. Pennsylvania Railroad Company, 306 Ky. 325, 207 S. W. 2d 755; Southeastern Greyhound Lines v. Collins, 305 Ky. 829, 205 S. W. 2d 1008. If appellee's testimony is true, she was in a helpless condition at Owensboro, and she notified the driver there that Owensboro was her destination and she desired to get off the bus.

Appellant complains because the court refused to permit it to read a deposition of the plaintiff taken at her home on July 1, 1947. This deposition was taken pursuant to notice given by the plaintiff and not by the defendant as if on cross-examination. It contained testimony contradictory in material respects of her testi-

mony at the trial, and on her cross-examination the attorney for the defendant read to her practically the entire deposition and questioned her concerning the contradictory statements. Thus the jury had before it the essential portions of the deposition, and the court did not err in refusing to permit it to be read again.

Complaint is made of several other rulings on the admission and rejection of testimony. Some of the questions objected to were irrelevant and some of the answers were not responsive, but we find none of the rulings of the court prejudicially erroneous.

Instruction No. 1 placed upon the defendant the duty of exercising the highest degree of care. This was error since a common carrier is required to exercise only ordinary care in looking after the comfort of its passengers. It is in the actual operation of the vehicle in which the passenger is riding that the carrier is required to exercise the highest degree of care. Southeastern Greyhound Lines v. Davis, 290 Ky. 362, 160 S. W. 2d 625. Appellee claimed not that the driver of the bus was negligent in its operation, but in failing to give her special assistance at Owensboro and in taking her beyond her destination. The instruction also is erroneous in that it required the driver to assist appellee in leaving the bus regardless of any knowledge on his part of her need of special assistance.

Instruction No. 2 should have limited the question of negligence to what occurred at Owensboro since, as heretofore stated, the evidence was insufficient to show that the driver had notice of appellee's need of special attention or assistance at Hardinsburg or any other point prior to the arrival of the bus at Owensboro.

Complaint is made of Instruction No. 8 on the measure of damages, but we find it substantially correct when read in connection with the other instructions, particularly Instructions Nos. 3 and 5, offered by appellant and given by the court.

There was proof that the hospital bills and bills for medicines at Evansville and Owensboro and the cost of an ambulance from Evansville to Owensboro amounted to $188.25, and that the expenses for physicians up to the time of the trial amounted to about $250. Clearly

most of this expense would have been incurred regardless of the alleged negligence of appellant. The proof as to appellee's physical pain and mental suffering or any aggravation of her illness by reason of her having been taken beyond her destination is not such as to justify the amount of the verdict returned by the jury. We find it grossly excessive.

The judgment is reversed with directions to grant appellant a new trial.